Section

(4)

Superior Court Decision

STATE OF RHODE ISLAND

NEWPORT, SC SUPERIOR COURT

DOUGLAS PELLETIER,

v C.A. No. N1 89 - 194

STATE OF RHODE ISLAND

**DECISION ON DEFENDANT'S**
**MOTION FOR POSTCONVICTION RELIEF**

**THUNBERG, J.** On January 8, 1990, before the Honorable Domenic Cresto, the defendant entered a plea of nolo contender to multiple felonies. The transcript of the plea reveals that the trial justice conducted an exhaustive, detailed interview with the defendant regarding the waiver of his Constitutional rights. In fact, the plea had been under discussion for several preceding weeks.

The factual basis for the plea involved horrific offenses that the defendant committed upon Nancy and Dawn Lyle in the early morning hours of January 13, 1989. At that time, Nancy awoke from a sound sleep in her bedroom to find the defendant – armed with a knife – straddling her and attempting to place a pillow over her head. She resisted and he proceeded to cut the pillowcase into strips. The defendant then gagged Nancy and bound her wrists. He then pulled up her nightgown and forcibly engaged in oral sex. He then removed his trousers, penetrated her vaginally, turned her over, penetrated her anally, and turned her over again and repeated vaginal penetration. The defendant, who, according to the victim, reeked of alcohol, wielded the knife throughout the entire ordeal. The defendant then awakened Nancy's daughter, Dawn, and forced her to go downstairs. Once in Nancy's room, he threatened to kill Dawn and himself. The

defendant put the knife against Dawn's breast and said he was "going to cut [it] off." The defendant then put the knife back to Dawn's throat, got under the covers with her, and tried to fondle her breasts and vaginal area, over her clothing. The defendant eventually bound her wrists and ankles and said he would kill her after he raped her. The defendant was still holding the knife to Dawn's throat when the police arrived, and threatened, in their presence, to kill her.

The defendant, in this motion for post-conviction relief, indicates that he was involved with Dawn for some time, and that they had a child together in April of 1988. For the succeeding eight months, "a lot of pushing back and forth between the [defendant] and victims" ensued During the several months before the incident defendant was drinking heavily and had two psychiatric hospitalizations.

The defendant alleges that the trial justice committed error by failing to follow the R.I. Rules of Criminal Procedure Rule 11 requirements mandated by the due process clause of the United States Constitution. He specifically asserts that he was never informed of the maximum sentence.

Defendant also asserts that he did not feel he "committed many of the elements" of certain charges and, therefore, the trial justice should have questioned him more thoroughly. Furthermore, defendant denies that he understood that he was admitting guilt, and, thus, his plea is infirm. The transcript, according to defendant, reveals that he failed to apprehend the nature and consequences of the plea.

As an ineffective assistance of counsel issue, defendant cites his attorney's failure to raise an intoxication/diminished capacity defense. The latter is particularly relevant to the assault with intent to murder charge. Finally, defendant claims that he did not meaningfully waive his right to a pre-sentence report.

Two attorneys have filed "no merit memoranda" with regard to defendant's post-conviction claims. Attorney Joseph deCaporale testified, at an evidentiary hearing, that the diminished capacity defense was totally inapplicable to defendant's case. He also explained that defendant's blood alcohol level of .137, five hours after his arrest, did not constitute a level which would have "paralyzed" defendant's will. Attorney deCaporale stated that the factual scenario constituted one of the most heinous and egregious sexual assaults he had seen in thirty-four years in practice. Apparently, the State's original sentencing recommendation was consecutive life sentences.

The defendant, after entering a plea of nolo contendre, was sentenced as follows:

(1) Counts 1, 2, and 3 (First Degree Sexual Assault): concurrently, 40yrs – 25 at the ACI, 15 suspended, 15 probation,

(2) Count 4 (Second Degree Sexual Assault). 15 yrs., consecutive to Counts 1, 2, and 3,

(3) Count 5 (Assault with a Dangerous Weapon): 10 yrs., concurrent with Count 4,

(4) Count 6 (Assault with Intent to Murder): 20yrs. – 10 ACI, concurrent with Count 5, 10 suspended / probation.

(5) Count 7 (Breaking and Entering, without Consent): 10yr., consecutive to Count 6.

(6) Count 8 (Assault with a Deadly weapon): 10yrs. ACI

At the time the defendant entered his plea of nolo contendre, no sentencing benchmarks existed for sexual assault offenses. There did exist a benchmark for felony assault with a knife, then Benchmark #13, which provided for a twelve to eighteen month sentence. There were also benchmarks for breaking and entering without the consent of the owner – less than jail if there was a close relationship between the perpetrator and the victim, and four to eighteen months if no relationship.

Departures from these sentencing ranges were, and are, to be made only when substantial and compelling circumstances exist. If a conviction is covered by a benchmark, and the sentence imposed is without that range, the sentencing justice is required to place specific reasons on the record for such departure. In the instant case, the defendant was sentenced to the maximum allowable penalties for the benchmarked offenses, without a statement from the trial justice as to what substantial and compelling circumstances justified the departure. Furthermore, the benchmarks contemplate the situation of a defendant who has been found guilty after trial. The rules also state that "the fact that a defendant has plead [sic] may also have a bearing on the choice of an appropriate sentence. In circumstances where a plea justifies departure, the judge should limit any reduction to within 25% of the lower end of the sentence range. (Superior Court Sentencing Benchmarks, "Using the Benchmarks," Rule 3, 1984).

After an extensive review of the predecessor benchmarks was conducted from 1995 through 1997, the number of crimes to which the benchmarks applied was substantially expanded. For First Degree Sexual Assault, multiple counts, Benchmark 31B provides for a sentencing range of fifteen to twenty-five years, and Benchmark 31C – first degree sexual assault with aggravating circumstances – recommends a sentence of over twenty years. For Second Degree Sexual Assault – multiple counts of touching/groping over clothing within the same incident – Benchmark 32B recommends a less than jail sentence. As to the latter offense, this defendant received the maximum jail sentence allowed, fifteen years, to be served consecutively to the twenty-five years to serve on Counts One, Two, and Three.

Rule 2 of the Benchmarks, "Using the Benchmarks," provides that where a defendant has been convicted of more than one criminal offense under the same indictment, the applicable

benchmark is determined by the most serious offenses. The benchmarks would probably not be applied to the other, less serious offenses. For example, after imposing a jail term within the benchmark range for the most serious offense, a judge may wish to impose a suspended sentence for a lesser offense." (Superior Court Sentencing Benchmarks, "Using the Benchmarks, Rule 2, 1984).

This defendant, after receiving a sentence – within the *present* benchmarks – for the most serious offense (First Degree Sexual Assault), then received consecutive maximum jail terms for less serious offenses which were part of the same incident. He received, for example, a consecutive ten year jail sentence for breaking and entering without consent of the owner, and, consecutive to that sentence, an additional ten year consecutive sentence for assault with a dangerous weapon upon Bradley Mello. Detective Mello was one of the responding officers to the Lyle residence attempting to defuse the terrifying situation. When the officers approached defendant with their guns drawn, the defendant asked them to shoot him. "The police approached, the defendant appeared to lunge at Detective Brad Mello. That was the *impression* that Detective Mello had at the time." (Transcript, 7) (emphasis added). Based upon the "impression" of the arresting officer, the defendant received a ten year consecutive jail sentence on the charge of assault with a deadly weapon.

Despite the fact that defendant wielded a knife throughout this ordeal, and despite his violent and frightening threats, he never used the weapon to inflict any wounds. The police received the emergency call to respond to the Lyle residence at 8:24 am. Newport Hospital records indicate that the defendant was seen in the emergency room at 9:34 a.m., and was observed by the examining physician to "smell of ETOH." Defendant's blood samples, received by the Department of Health at 1:50p.m. the same day, revealed a blood-alcohol concentration of

.137. The hospital records also indicate that defendant tested positive for the presence of cannabinoids.

During the fall preceding this incident, defendant had two psychiatric admissions to Newport Hospital, each involving homicidal/suicidal ideation. On October 10, 1988, Mr. Pelletier was brought to the hospital by the police after he disclosed to a neighbor that he was going to shoot himself. The physician's notes report a "long [history] of alcohol abuse and a prior [history] of cocaine and marijuana use." The defendant is described as "very angry at girlfriend [victim Dawn Lyle] who he states uses cocaine and marijuana and doesn't want child growing up in that environment. Patient continues to drink 1-1½ cases beer/day and occas. [sic] ½ pint alcohol." Mr. Pelletier told the treating physician that he had been having thoughts about wanting to kill himself, as well as kill his ex-girlfriend. He had admitted to "heavy drinking since the age of 17 with recent excessive use. He drinks in the morning until he passes out. He also admits to recent use of cocaine."

The defendant is reported to have obsessive thought content regarding killing his girlfriend. Defendant's discharge diagnosis – 3 days later – was: (1) alcoholism, and (2) probable sociopathic personality. He was instructed to go to the V.A. Alcohol Unit "for screening and probable admission."

Two and one half weeks later, Mr. Pelletier called the police himself and told them he was having homicidal and suicidal thoughts. He was admitted to Newport Hospital's psychiatric ward and told the treating physician that "[last Sunday] while inebriated he had thoughts about killing his ex-girlfriend's mother and he went to their house with a knife but got no further. He left and called the police who brought him here." Mr. Pelletier was discharged the next day with the doctor's conclusion that he (the defendant) was suffering from alcoholism and reactive

depression, but was neither suicidal nor homicidal.

The record of defendant's plea and sentencing contains no reasons or citations to circumstances which explain the foundation for defendant's sixty year jail term. At the time of the commission of the subject offenses, Mr. Pelletier was a twenty-five year old individual with no criminal record. He was an alcoholic and "probable sociopath" who had been hospitalized for homicidal and suicidal ideation. The presence or absence of a defendant's criminal record must be considered in fashioning any sentence. The defendant's mental and emotional make-up and his attitude towards society and feeling about the crime are other important factors. (This defendant wanted to say something, on the record, to the victims, but the trial justice did not permit him to do so. (Transcript, 15)).

This Court is of the opinion that, in the circumstance of this particular case, justice requires a thorough pre-sentence investigation, a comprehensive psychiatric evaluation, and a sentencing hearing in which the Benchmarks are meaningfully addressed. Therefore, the Court will order a pre-sentence report and appoint counsel to represent Mr. Pelletier at "re-sentencing."